# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 31, 2025

Lyle W. Cayce
Clerk

No. 24-50462

Legacy Housing Corporation,

*Plaintiff—Appellant*,

*versus*

City of Horseshoe Bay, Texas; Horseshoe Bay Property Owners Association; Jaffe Interests, LP, *formerly known as* Horseshoe Bay Resort Limited, *formerly known as* Horseshoe Bay Resort, Incorporated; Horseshoe Bay Resort Development, LLC,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-1156

Before Higginbotham, Jones, and Southwick, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

Legacy Housing bought hundreds of lots for development and also purchased adjacent land on which to build a road connecting the lots to a nearby highway. The land was subject to restrictions barring such a road. Legacy challenges those restrictions, alleging a conspiracy between the City and other defendants to prevent it from developing its lots. The district court granted summary judgment to the defendants. We AFFIRM as modified.

No. 24-50462

## FACTUAL AND PROCEDURAL BACKGROUND

In 2019, Legacy Housing bought several hundred vacant lots in a neighborhood at the southern edge of Horseshoe Bay, Texas, a city about one hour northwest of Austin. That neighborhood was and remains zoned for manufactured housing, subject to various restrictions on construction. One such restriction, existing since 2009, allows only two permits at a time for constructing housing for which there is not yet a buyer, *i.e.*, speculative housing. There also are requirements for contractors and subcontractors, utility hookup fees, and setback requirements. These have all changed to some degree since Legacy purchased lots in 2019. Property owners can seek variances.

Apart from these zoning restrictions, Legacy also bought its lots subject to a declaration of reservations. Among other things, the declaration restricts the use of the lots to "single-family mobile home dwelling[s]," requires "improvements" to be pre-approved by the architectural committee, and reserves a right of way and easement for utilities and drainage.

Legacy also bought 95 acres of land in the City of Horseshoe Bay's extraterritorial jurisdiction (ETJ), between a nearby highway and the southern edge of the neighborhood. We need not wade deeply into relevant Texas statutes other than to say a city's ETJ is defined and governed by Chapter 42 of the Texas Local Government Code as an area around the formal boundaries of a city. This land within the ETJ was subject to an agreement that the property could only be used for "agriculture, wildlife management, and/or timber land . . . which will include . . . existing single-family residential use of the Property."

2

No. 24-50462

In 2021, despite these restrictions, Legacy built a road over the ETJ property, the greenbelt,[1] and three of the development lots. It advertised the road as providing neighborhood residents a much shorter route to and from the highway and amenities Legacy planned to build on the ETJ property. The defendants tried to stop Legacy from completing this road on the basis that it violated valid restrictions, but the road was completed.

Legacy alleges a conspiracy among the defendants — the City, the property owners' association (POA), and developers Jaffe Interests, LP, and Horseshoe Bay Resort Development, LLC. Legacy claims that the defendants unlawfully conspired to prevent it from developing manufactured housing on the lots. The events regarding the road were just one part of this alleged conspiracy.

These are Legacy's claims against the individual defendants:

(1) The City for regulatory takings based on the zoning restrictions;

(2) All four defendants under Section 1983 for violations of substantive due process, procedural due process, the Takings Clause, and equal protection;

(3) All four defendants for civil conspiracy for the same reasons;

(4) The POA for breach of fiduciary duty in denying access to the greenbelt;

(5) The POA and the developers for negligence in denying access to the greenbelt strip;

---

[1] "Greenbelt," as used throughout this opinion, refers to land intended to remain undeveloped surrounding a community that serves as a buffer zone. The relevant area of greenbelt in this case is a five-foot-wide stretch of land separating the back of a neighborhood from the property to the south.

(6) The POA and the developers on a strips and gores claim[2]; and

(7) All four defendants for declaratory judgments related to the other claims.

In light of the newly completed road, the City counterclaimed for breach of the ETJ development agreement and sought related declaratory judgments and injunctive relief. Horseshoe Bay Resort Development also counterclaimed for breach of the restrictive covenant on the development lots and sought related declaratory judgments and injunctive relief.

Various motions followed. Legacy moved to dismiss the City's counterclaims for lack of supplemental jurisdiction. That motion was denied. The City moved to dismiss all of the claims against it apart from the regulatory takings claim. That motion was granted. Legacy moved for partial summary judgment on its strips and gores claim. All the defendants moved for summary judgment on all claims in which they were implicated. The defendants' motions were granted and Legacy's motion denied. The district court then entered final judgment. Legacy timely appealed.

## DISCUSSION

On appeal, Legacy argues that the district court erred in its resolution of nearly every claim in this case. We begin by identifying challenges that have been forfeited. Then, we discuss the resolution of the claims against the City. Finally, we discuss the resolution of the claims against the remaining defendants.

---

[2] The strips and gores doctrine is a unique creature of Texas law used to resolve the ownership of relatively small strips of land. The details of the doctrine are discussed below. Legacy used the doctrine to claim ownership of the five feet of greenbelt between its development lots and the ETJ property.

No. 24-50462

## I.    *Forfeited Issues*

Legacy forfeited several alleged errors.  First, Legacy sought to challenge the grant of a motion to dismiss its equal protection and due process claims against the City and summary judgment on those same claims against the remaining defendants.  Legacy did not list this issue in its statement of issues.  Further, Legacy's header in the body of the brief mentions the equal protection claim, but the discussion that follows merely lays out general principles without applying them to this case.  Legacy's inadequate briefing forfeited its challenge to the denial of its equal protection and due process claims.  *See United States v. Quintanilla*, 114 F.4th 453, 464 (5th Cir. 2024) (failure to list an issue in the statement of issues); *Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (failure to explain how the district court erred).[3]

Next, Legacy sought to challenge the grant of a motion to dismiss its civil conspiracy claim against the City, a dismissal based on governmental immunity.  Legacy's discussion of this claim suffices to preserve the challenge with respect to the remaining defendants.  With respect to the City, though, Legacy fails to explain how the district court erred.  Legacy forfeited its challenge to the dismissal of its civil conspiracy claim against the City.  *See Brinkmann*, 813 F.2d at 748.

---

[3] At most, Legacy's later discussion of its Section 1983 conspiracy claims may have preserved an argument that it was deprived of "property" in violation of its due process rights when the defendants interfered with its construction of the road over the ETJ property, the greenbelt, and the development lots.  Our discussion throughout the opinion forecloses such a claim: Legacy had no right to build the road over the ETJ property; Legacy did not own the greenbelt under the strips and gores doctrine; and Legacy had no right to build the road over the development lots.

No. 24-50462

Finally, Legacy sought to challenge the dismissal of its claims for declaratory judgment against the non-City defendants. The following is the extent of Legacy's briefing on this issue:

> The sole basis for granting summary judgment to HSBR Development, Jaffe and POA on Legacy's declaratory judgment action was the summary judgment rulings on all of Legacy's underlying claims. Legacy has demonstrated above that these summary judgment rulings were error.

Legacy's declaratory judgment claims do not perfectly map onto the underlying claims it raises on appeal. Some do, others do not. For example, Legacy sought a declaration that "[t]he POA does not have the authority to discriminate and provide a disproportionate amount of funding from the dues to the Resort as compared to the South residents." That declaration does not logically connect to any of the underlying claims Legacy raises on appeal. Legacy's arguments do not inform the court of any specific error in denial of the declaratory judgments it sought, and the issue is forfeited. *See Brinkmann*, 813 F.2d at 748.

\* \* \*

The remaining issues relate to claims that were resolved at summary judgment. "We review the district court's order granting summary judgment *de novo*, applying the same standards that the district court applied." *ACS Constr. Co. of Miss. v. CGU*, 332 F.3d 885, 887–88 (5th Cir. 2003). "Summary judgment is warranted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 578 (5th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).

6

## II.   *Claims Involving the City of Horseshoe Bay*

Legacy argues that the district court erred by granting the City summary judgment on (1) its regulatory takings claim and (2) the City's counterclaim for breach of the ETJ development agreement and restrictive covenant.  We will discuss those claims in that order.

### A. Regulatory Takings

Regulatory takings claims are reviewed under a three-factor balancing test, considering:

(1) "[t]he economic impact of the regulation on the claimant";

(2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and

(3) "the character of the governmental action," *i.e.*, whether the action "can be characterized as a physical invasion by government" or is instead "interference aris[ing] from some public program adjusting the benefits and burdens of economic life to promote the common good" — "[z]oning laws are . . . the classic example" of the latter.

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124–25 (1978). Whether a regulatory taking has occurred is an "essentially *ad hoc*, factual inquir[y]" evading any "set formula."  *Id.* at 124 (citing *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962).  The goal of the analysis is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

Legacy advanced a regulatory takings claim based on four different sets of requirements:  (1) supposedly heightened restrictions on manufactured housing subcontractors; (2) speculative housing permit caps;

(3) utility hookup fees; and (4) setback requirements. We will separately address each.

### 1. *Subcontractor Restrictions*

First, Legacy argues the City imposed heightened requirements on subcontractors when working for manufactured housing contractors as opposed to traditional housing contractors. In Legacy's view, these heightened requirements amounted to a regulatory taking by effectively preventing it from hiring subcontractors for its projects. The district court granted the City summary judgment on the basis that Legacy had misinterpreted the ordinances in question. The district court concluded that subcontractors were always subject to the more specific subcontractor provision, regardless of whether they were working for manufactured housing contractors or traditional housing contractors.[4]

To explain Legacy's argument, we start with the text of the ordinances in question. Section 3.03.010 of the Horseshoe Bay building regulations establishes permitting application requirements for contractors and subcontractors. Subsections (a)(9)(F) and (H) apply to general contractors and manufactured housing contractors, respectively, and require background checks, references, and insurance. Subsection (a)(9)(G) applies to subcontractors and requires only a license and a certificate of insurance. Although this subsection does not define "subcontractor," it gives examples:

---

[4] Although Legacy faults the district court for improperly weighing the evidence at summary judgment, the district court merely resolved a pure question of law, which is permissible. *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991) (district court may decide pure questions of law at summary judgment); *City of New Orleans v. BellSouth Telecomms., Inc.*, 690 F.3d 312, 322 (5th Cir. 2012) (interpretation of a Louisiana ordinance was a pure question of law); *Jones v. City of Palestine*, 266 F. App'x 320, 322 (5th Cir. 2008) (same for a Texas ordinance).

"mechanical, electrical, plumbing." Legacy's briefing largely focuses on plumbers and electricians.

Section 3.03.006(b) defines "[m]anufactured home contractor" as

[a]ny one of the following who participate in the placement of any manufactured home on a property in the city: The manufactured home dealer/seller; the retail/broker/installer with RBI license number from the Texas Department of Housing and Community Affairs; the delivery company if different from the seller; the set-up company if different from the seller; the trim-out company for a double wide if different from the seller; and the improvements contractor for water, wastewater and electric utility hook-ups, foundation/tie-downs and skirting.

Legacy interprets this last clause referring to "improvements contractor" as subjecting subcontractors to the higher manufactured housing requirements when providing hookups and the like for manufactured housing contractors. We disagree. When one term is general and another specific, the specific provision will usually control. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 183 (2012). Here, the specific provision is the express listing of "mechanical, electrical, [and] plumbing" subcontractors. Legacy is right that applying heightened requirements to manufactured housing subcontractors seems irrational, but that supports that Legacy is misinterpreting the provision. *See City of Laredo v. Villarreal*, 81 S.W.3d 865, 868 (Tex. App.—San Antonio 2002, no pet.) (rejecting the plaintiffs' interpretation of an ordinance because it "would lead to absurd results"). Further, although the interpretation of the ordinance is a pure question of law, it is of some significance that Legacy provides no examples of the City holding manufactured housing subcontractors to the higher manufactured

housing contractor requirements. The district court did not err in rejecting Legacy's reading of the ordinance.

### 2. Permit Caps

Second, Legacy argues that the "two-at-a-time" limit on speculative housing permits (*i.e.*, permits for houses without buyers) effects a regulatory taking by functionally preventing it from efficiently installing manufactured housing at scale. The district court granted the City summary judgment, emphasizing that the two-permit cap existed as early as 2009, ten years before Legacy bought the development lots.

First, although the fact that a limitation was pre-existing is relevant in evaluating a landowner's reasonable, investment-backed expectations, it must not be afforded *per se* dispositive status. *Murr v. Wisconsin*, 582 U.S. 383, 398 (2017). It appears the district court granted the City summary judgment solely because the two-permit cap preceded Legacy's purchase of the development lots. In making our own *de novo* evaluation, we would need to consider the *Penn Central* factors. A problem quickly arises in attempting to do so. Legacy argues that it was allowed up to six speculative housing permits at a time until recently. On the present record, Legacy has not shown that the City's practice has actually changed. We explain.

The ordinance allows Legacy to request additional permits beyond the two-permit cap. The record is devoid of evidence that Legacy has made such requests. Therefore, it may be that Legacy could still install up to six manufactured homes at a time if it requested additional permits beyond the cap. Until Legacy asks, the courts are incapable of evaluating the existence or extent of any deprivation. *See Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985), *overruled in part on other grounds by, Knick v. Township of Scott*, 588 U.S. 180 (2019). "A court cannot determine whether a regulation has gone 'too far' unless it knows how

far the regulation goes." *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986).

Consequently, Legacy's challenge to the two-permit cap is not prudentially ripe. *See Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 737 (1997); *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 n.2 (5th Cir. 2021) (prudential ripeness requirement for regulatory takings remains good law). The ripeness requirement is only prudential, not jurisdictional. *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 88–89 (5th Cir. 2011). Even so, summary judgment will often be inappropriate when a regulatory takings claim is prudentially unripe. This case provides a good example.

Legacy's expert reports — discussed in greater detail below — asserted that the two-permit cap rendered the lots entirely undevelopable. Based on that assertion, as the district court recognized, the 85% diminution of the raw lot values could be sufficiently serious for the economic impact factor to favor Legacy. *See CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (noting an earlier case in which a 77% drop in property value was sufficiently serious for the economic impact factor to favor the plaintiff). That assertion, though, cannot be evaluated until Legacy requests and is denied additional permits. Even if we were to assume that no rational jury could find that the other two *Penn Central* factors favored Legacy, summary judgment would still be inappropriate. *Penn Central* establishes a deliberately "ad hoc, factual inquir[y]," not a counting exercise. *Penn Central*, 438 U.S. at 124. The district court should have dismissed the regulatory takings claim without prejudice insofar as it challenged the two-permit cap. *See DM Arbor Ct.*, 988 F.3d at 220. We will modify the dismissal to reflect that it is without prejudice.

### 3. *Utility Hookup Fees*

Third, Legacy argues that fees for hooking up new manufactured homes to the City's sewer system are so excessive as to constitute regulatory takings. The district court granted summary judgment to the City, classifying the utility hookup fees as user fees, which are categorically not takings. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 615 (2013). Legacy does not meaningfully counter the district court's reasoning, instead simply asserting that the fees are excessive and were imposed for the improper purpose of preventing Legacy from installing manufactured housing.

The utility hookup fees here, "imposed for the reimbursement of the cost of government services," are user fees, not takings. *See United States v. Sperry Corp.*, 493 U.S. 52, 63 (1989). The district court did not err.

### 4. *Setback Requirements*[5]

Fourth, Legacy briefly argues that the setback requirements are regulatory takings in that they make it "virtually impossible to place Legacy's houses on the [development] lots." The district court granted the City summary judgment because (1) Legacy failed to provide competent evidence of a sufficiently serious economic impact; (2) Legacy should have expected reasonable new zoning restrictions over time; and (3) the character of the governmental action, *i.e.*, zoning, favored the City. We will not say more

---

[5] We use "setback requirements" as a shorthand for the space-related requirements imposed by the City. This category of requirements includes (1) "paved driveway[s] of not less than 400 square feet and at least 12 feet wide"; (2) "[p]orches, decks, and patios [with] a combined area of 150 square feet [that] cannot be included in the setbacks"; and (3) pre-existing setback requirements. The City correctly notes that the setback requirements themselves pre-existed Legacy's purchase of the development lots, but the effect of the other requirements in restricting the space for Legacy's homes cannot be evaluated apart from the pre-existing setback requirements.

about the third *Penn Central* factor.  The setback requirements are zoning regulations, and so the third *Penn Central* factor favors the City.  *See Penn Central*, 438 U.S. at 124–25.

Before evaluating the first *Penn Central* factor, economic impact, we recount what evidence Legacy provided on that score.  Legacy offered two expert reports by Chad Denton and Legacy executive Curtis Hodgson.  Both reports stated that the raw value of each lot — *i.e.*, the value of the lot without a house on it — dropped from $35,000 to $5,000, without specifying how they arrived at $5,000.[6]  Next, both experts said that the expectancy value of each lot — *i.e.*, the value of the lot with a house on it, after deducting development and marketing costs — dropped from $60,500 to $5,000. Although both experts suggested that "fixed costs due to the new requirements . . . will increase to approximately $45,000" from $30,000,[7] they concluded that the expectancy value was $5,000, *i.e.*, the raw lot value, because developing the lots was completely infeasible.

The district court found that the economic impact factor favored the City for three reasons.  We need consider only one.  The one we analyze is that the post-taking expectancy value was based on the proposition that the lots were rendered entirely undevelopable, and that proposition was refuted by the experts' concession that the setback requirements merely increased

---

[6] Hodgson and Denton both calculated an increase in raw lot value of $20,000 per lot if Legacy could build a road connecting the back of the neighborhood to the nearby highway.  We ignore that number because, as we will explain below, Legacy never had a right to build that roadway.  Although pre-existing limitations are not *per se* immune from a regulatory takings analysis, Legacy does not argue that barring highway access was a regulatory taking.

[7] Neither expert report specified whether this was $45,000 in entirely new costs or instead some lesser increase on a pre-existing amount of fixed costs.  At his deposition, Hodgson clarified that there was a $15,000 increase from $30,000 in pre-taking costs for fees, install, and improvements.

development costs by $15,000. It may be that the expert reports' assertion that the two-permit cap made development entirely infeasible would often suffice to support the asserted expectancy value. Here, though, we are considering the setback requirements separately from any other requirements, including the two-permit cap. That is because the other requirements have fallen out of the case for reasons that logically precede application of the *Penn Central* factors. Without those other requirements, nothing in the expert reports supports the conclusion that the post-taking expectancy value is $5,000. Indeed, the expert reports themselves suggest that the value should be $45,500 when considering only the setback requirements.[8] Even supposing lost profits can be validly considered in this analysis (a question we do not decide), we agree with a sister circuit that a mere 25% diminution does not demonstrate a regulatory takings claim. *See CCA Assocs.*, 667 F.3d at 1246 ("[W]e are aware of no case in which a court has found a taking where diminution in value was less than 50 percent." (quotation marks and citation omitted)).

The expert reports' conclusion that the post-taking raw lot value dropped to $5,000 is similarly unsupported when considering only the

---

[8] Although the expert reports suggest that development was also completely infeasible because Legacy could not fit any of its models on the lots, that suggestion is flatly refuted by Hodgson's own deposition admissions. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding courts should disregard a version of events that is "blatantly contradicted by the record, so that no reasonable jury could believe it" at summary judgment); *cf. S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (agreeing that summary judgment cannot be defeated by the submission of affidavits that contradict sworn testimony without explanation). As Hodgson admitted at his deposition, Legacy has models ranging "from 400 square feet to 2,700 square feet and . . . all points in between." Based on the evidence in the record, no rational jury could find that the lots were too small to fit a Legacy model. To the extent that Legacy might lose profits by installing smaller models, the expert reports provide no basis to conclude that those lost profits would be significant enough for the economic impact factor to favor Legacy.

setback requirements. Although the expert reports themselves did not explain how they arrived at this number, the experts' deposition testimony shows that the value was derived from the going market rate, as indicated by the prices at which Legacy bought the lots. Hodgson explained the discrepancy between this price and the estimated $35,000 pre-taking raw lot value as "[t]he delta between being able to put a mobile home on it and not being able to put a mobile home on it." In other words, the lots were worth more to Legacy than to other buyers because Legacy had the resources necessary to install manufactured homes on the lots. If the lots were rendered entirely undevelopable by new regulations, they would be worth only the going market rate of $5,000.

When considering only the setback requirements, nothing in the expert reports supports the conclusion that the lots were entirely undevelopable rather than $15,000 more expensive to develop. The expert reports do not specify what the post-taking raw lot value would be when considering only the setback requirements. We may not assume that parties would fill evidentiary gaps at summary judgment. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). A rational jury would have no evidentiary basis to conclude that diminution in the raw lot values was significant enough for the economic impact factor to favor Legacy.

Next, the district court found that the second *Penn Central* factor, investment-backed expectations, also favored the City. The district court appropriately focused on Legacy's "primary expectation concerning the use of the parcel," *i.e.*, building manufactured housing. *See Penn Central*, 438 U.S. at 136. Because Legacy can still accomplish that goal, the setback requirements did not interfere with its reasonable, investment-backed expectations.

No. 24-50462

The record conclusively establishes that Legacy can fit its models onto the development lots. As Hodgson admitted at his deposition, Legacy has models ranging "from 400 square feet to 2,700 square feet and . . . all points in between." Any interference with Legacy's reasonable, investment-backed expectations is limited. With each *Penn Central* factor favoring the City, summary judgment was appropriate.

### B. Breach of the ETJ Development Agreement and Restrictive Covenant (Counterclaim)

Legacy also argues that the district court erred in resolving the City's counterclaim for breach of the ETJ development agreement and restrictive covenant. To preface, Legacy built a paved road over the ETJ property, connecting to the back end of the neighborhood.[9] The road had gates on each end and a dividing line down the middle. Under the ETJ development agreement, ETJ property may only be used for "agriculture, wildlife management, and/or timber land . . . which will include . . . existing single-family residential use of the Property," unless the property owner gets "prior written consent" from the City to use the property for other purposes. The district court found — and Legacy does not meaningfully contest on appeal — that the ETJ development agreement binds Legacy and satisfies all the requirements for an enforceable restrictive covenant. Legacy argues (1) that the road over the ETJ property is a permissible "driveway"; and (2) that the City committed a prior material breach of the ETJ development agreement based on an email sent by the City to the Texas Department of Transportation.

---

[9] To be clear, the part of the road on the ETJ property is paved, and the part of the road over the greenbelt and the development lots is not paved. In this section we are only discussing the portion of the road on the ETJ property.

The district court found (1) that the road exceeded the permissible uses authorized by the ETJ development agreement; and (2) that the email did not constitute a prior material breach. We agree. On the "driveway" issue, the label Legacy puts on the road is immaterial. What matters is its intended use as a publicly available shortcut to the highway, and also as a means to access planned future amenities (which would independently violate the ETJ agreement). To the extent Legacy argues there is a fact issue as to whether the road was an innocent "driveway" as opposed to what we have described, the record flatly refutes Legacy's position. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding courts should disregard a version of events that is "blatantly contradicted by the record, so that no reasonable jury could believe it" at summary judgment). Legacy openly advertised the road as providing "direct access" to the highway and also as a means to access a planned "multi-acre amenity package on the [ETJ property] that could possibly include a brand-new swimming pool, state of the art playground, and multi-purpose community center." The road is not a "driveway" facilitating permissible uses of the ETJ property.

On the issue of prior material breach, the email demonstrates only that the City was aware of Legacy's road and believed (accurately) it violated the ETJ development agreement. Legacy argues that the City committed a prior material breach by trying to get the Texas Department of Transportation to do something that would trigger annexation of the ETJ property in violation of the ETJ development agreement. This argument falls with Legacy's flawed claim that the road was a permissible "driveway." If Legacy was building a publicly available shortcut to the highway and a means to access planned future amenities — and it was — then annexation would not violate the ETJ development agreement. The ETJ development agreement allows the City to annex the ETJ property "if the Owner *commences* development of the Property in violation of th[e] Agreement." Legacy breached first when

it started building the road for the purposes outlined in its letter. The email was sent after it became clear what Legacy was doing. Thus, the email was neither prior nor a breach.

Contrary to Legacy's claims, it does not matter whether the City had conclusive evidence of Legacy's intentions at the time. What matters is what Legacy was doing. There is nothing in the record to suggest that Legacy's plans changed between when the email was sent and when Legacy advertised its plans. On the contrary, Hodgson admitted at his deposition that this was Legacy's plan from the time it bought the ETJ property.

Regardless, even if the advertisement itself post-dated the November 2, 2021 email, there was clear evidence of Legacy's intentions before then. On October 22, 2021, pictures were taken from the development lots showing that Legacy had finished paving the road up to the boundary between the ETJ property and the greenbelt. At his deposition, Hodgson acknowledged that Legacy had built this road. That road had nowhere left to go but over the greenbelt strip and development lots to connect to the neighborhood's streets. Legacy's intentions could hardly have been clearer. No rational jury could find that the City breached the ETJ development agreement first.

## III.    *Claims Involving the Remaining Defendants*

Legacy argues that the district court erred by granting the remaining defendants summary judgment on (1) its strips and gores claim; (2) its negligence and gross negligence claims; (3) its Section 1983 and civil conspiracy claims; (4) its breach of fiduciary duty claim against the POA; and (5) the developers' counterclaim for breach of restrictive covenant. We will discuss those claims in that order.

No. 24-50462

### A. Strips and Gores[10]

Legacy argues that not only were the remaining defendants not entitled to summary judgment on its strips and gores claim, but that Legacy was itself entitled to summary judgment on the claim.

The strips and gores doctrine is a unique creature of Texas law designed to encourage the use and development of land. *See Strayhorn v. Jones*, 300 S.W.2d 623, 638 (Tex. 1957) (discussing the purpose of the doctrine). The Supreme Court of Texas explained this way:

> It is well known that separate ownership of long narrow strips of land, distinct from the land adjoining on each side, is a fruitful source of litigation and disputes. To avoid this source of contention, it is presumed that a grantor has no intention of reserving a fee in a narrow strip of land adjoining the land conveyed when it ceases to be of use to him, unless such fee is clearly reserved. The reason for the rule is obvious. Where it appears that a grantor has conveyed all land owned by him adjoining a narrow strip of land that has ceased to be of any benefit or importance to him, the presumption is that the grantor intended to include such strip in such conveyance; unless it clearly appears in the deed, by plain and specific language, that the grantor intended to reserve the strip.

*Cantley v. Gulf Prod. Co.*, 143 S.W.2d 912, 915 (Tex. 1940). Thus, if a landowner has conveyed all of his or her land except for a relatively

---

[10] We recognize that neither the POA nor the developers claim to own the greenbelt strip, which raises questions about the adversity of the parties on Legacy's strips and gores claim. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (requiring parties to have "adverse legal interests" for a case to be justiciable (quoting *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240–41 (1937))). Nevertheless, we find there to be sufficient adversity because the POA and the developers contest Legacy's ownership of the greenbelt strip through the strips and gores doctrine in defending against other claims in the case.

insignificant strip, Texas law presumes the intention was to convey the strip as well, unless the deed expressly reserves the strip. *Id.*

Here, Legacy invokes the strips and gores doctrine to assert that it owns the five-foot-wide strip of greenbelt between the back of one of the development lots and the ETJ property. Legacy needs to cross that small portion of the greenbelt for its road from the development lots to the highway.[11]

As background, all the land on the relevant plat was formerly owned by a single entity: Kings Land. At various times, Kings Land conveyed all the lots by express reference to the plat. The plat included a clearly delineated greenbelt, mapping the boundaries between the lots and the long, continuous greenbelt. Kings Land did not expressly reserve the greenbelt in the deeds; instead, it conveyed the described property that the plat showed did not include the greenbelt. For other plats, Kings Land conveyed the greenbelt to the POA, but the record contains no evidence that Kings Land ever expressly conveyed the portion of the greenbelt relevant in this case to anyone. Kings Land no longer exists, and it cannot (but need not) be determined on this record who owns the greenbelt.

The district court concluded that the strips and gores doctrine did not apply here for three independent reasons: (1) Kings Land unambiguously reserved the greenbelt by reference to the plat, which clearly marked the boundaries of each lot and the greenbelt; (2) the greenbelt as a whole is not

---

[11] To have a right to construct the entire road, Legacy would need a right to cross the ETJ property, the greenbelt, and the development lots. Even so, some of Legacy's claims for damages rely on the idea that Legacy owns the greenbelt strip, and those claims would not require Legacy to show that it was entitled to build the full road (although not having a right to build the entire road certainly would affect any damages Legacy could recover). We make this observation in further support of our conclusion that the necessary adversity exists for us to rule on this issue.

small; and (3) Kings Land's continued access to the greenbelt strips through the other greenbelt strips showed that the strips at issue were still useful to Kings Land when the conveyance was made.

The first reason is correct and sufficient. Over eighty years ago, we held that Texas's strips and gores doctrine does not apply to unambiguous conveyances unless the case involves a road or right of way, in which case courts presume that the grantor intended to convey the center of the road or right of way.[12] *See Simon v. Rudco Oil & Gas Co.*, 132 F.2d 211, 212 (5th Cir. 1942). That holding remains binding under our rule of orderliness even though the Supreme Court of Texas opinion in *Strayhorn* could plausibly be read as at least abrogating an earlier opinion that *Simon* relied upon, *i.e.*, *McKee v. Stewart*, 162 S.W.2d 948, 950 (Tex. Comm'n App. 1942). *Strayhorn* does not unambiguously abrogate either *Simon* or *McKee*, and, as we will explain, that is the relevant question.[13]

Our rule of orderliness, requiring a later panel to adhere to the published opinion of an earlier one, fully applies to the court's interpretations

---

[12] Most of the cases cited by Legacy involve this centerline presumption or a related presumption that a deed noting an existing easement merely acknowledges the easement's existence without reserving the land subject to the easement. Legacy also cites a case for the proposition that a reservation marked on a plat does not prevent application of the strips and gores doctrine if the deed does not mention the reservation. *See Reeves v. Towery*, 621 S.W.2d 209, 212–13 (Tex. App.—Corpus Christi 1981, writ ref'd n.r.e.). That case is distinguishable because the reservation marked on the plat was within the boundaries of the lot as also marked on the plat. *Id.* at 210. The case does not speak to the question whether the strips and gores doctrine would have applied if the lot as marked on the plat had not encompassed the reserved portion.

[13] *Strayhorn* may be better explained as a case about rivers, involving an entirely separate presumption that conveyances follow river lines and grant concomitant riparian rights. *See Strayhorn*, 300 S.W.2d at 631–32. As with roads and rights of way, Texas law recognizes a centerline presumption for rivers. *Id.* at 636. Even then, although the deed in *Strayhorn* was facially unambiguous, its description clashed with the contract's description, creating an ambiguity. *Id.* at 638.

of state law. *FDIC v. Abraham*, 137 F.3d 264, 268–69 (5th Cir. 1998). A prior panel's determination of the meaning of state law must be "followed by other panels without regard to any alleged existing confusion in state law, absent a subsequent state court decision or statutory amendment which makes this Court's decision clearly wrong." *Lee v. Frozen Food Express, Inc.*, 592 F.2d 271, 272 (5th Cir. 1979). Our *Simon* opinion is not clearly wrong under Texas law.

Additionally, we also consider the fact that the strips and gores doctrine is about misdescriptions, *i.e.*, a grantor intends to convey all owned property but does not accurately describe all. Here, far from meaning to convey the greenbelt strip along with other property, Kings Land intended to retain the small portion of the greenbelt that was contiguous to the granted property. It was a slice of the much larger band of greenbelt that was to benefit all the property it bordered. By omitting the adjacent section of greenbelt, the description in the deed was entirely accurate.[14] Legacy did not receive the relevant portion of the greenbelt under the strips and gores doctrine.

### B. *Negligence and Gross Negligence*

Legacy argues that the district court erred by granting the remaining defendants summary judgment on its negligence and gross negligence claims. Those claims are based on the idea that the remaining defendants had a duty not to interfere with Legacy's use of the greenbelt. To succeed on a claim for negligence in Texas, "[t]here must be a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the

---

[14] The strips and gores doctrine applies to determining what land a grantor conveys at the time of a deed. *See Seager v. Fry*, 707 S.W.3d 452, 468 (Tex. App.—Eastland 2025, no pet.). Later events could affect current title through adverse possession or some other doctrine, a possibility not raised in this appeal. *See id.* at 469.

breach." *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). "The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

The district court granted the remaining defendants summary judgment on these claims because Legacy did not receive the greenbelt strip under the strips and gores doctrine, and "Legacy has not established that there is an applicable legal duty to help Legacy gain access to the greenbelt strip for the purposes of building a driveway or pavement over it." Neither Legacy nor the defendants have been shown to own the greenbelt. Thus, for purposes of analysis, the issue is whether the defendants' simply interfering (without physical violence or some other tortious conduct) with a non-owner's effort to build a road over land breaches a duty. No authority supporting such a duty has been offered. Summary judgment was appropriate.

### C. Section 1983 and Civil Conspiracy

Legacy argues that the district court erred by granting summary judgment to the remaining defendants on the Section 1983 and civil conspiracy claims. The district court granted summary judgment because Legacy failed to substantiate a predicate tort or Section 1983 violation. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (requiring an underlying tort for a civil conspiracy claim); *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (requiring an underlying Section 1983 violation for a Section 1983 civil conspiracy claim).

Legacy challenges this ruling by arguing that it was unlawfully deprived of property rights to build a road over the ETJ property and the greenbelt strip. Those arguments mirror Legacy's arguments on its other

23

claims. Based on our previous discussion of those claims, summary judgment was appropriate on the Section 1983 and civil conspiracy claims.

### D. *Breach of Fiduciary Duty (POA)*

Legacy briefly argues that the POA breached a fiduciary duty to let Legacy build a road on the greenbelt strip, such that summary judgment for the POA on Legacy's breach of fiduciary duty claim was improper. As a member of the POA, Legacy has a right to the "use and enjoyment of the Properties and Common Land as provided in the Restrictions." The district court granted the POA summary judgment because Legacy claims that it both owned the property and POA had a duty to grant it access were irreconcilable. The POA does not claim to own the greenbelt strip. Therefore, any duty the POA had regarding the greenbelt strip was not fiduciary in nature because it exceeded the scope of the fiduciary relationship. *Palmer v. Fuqua*, 641 F.2d 1146, 1155 (5th Cir. Unit A Apr. 1981) (relying on *Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977)).

Legacy suggests the district court erred by not considering its "alternative" argument that "the POA's conduct in acting to *completely* prevent Legacy from accessing the greenbelt" was a breach of fiduciary duty. Legacy has not shown error. If the POA did not own the greenbelt strip — and Legacy and the POA agreed it did not — any duty the POA had regarding the greenbelt strip was not fiduciary in nature. *See Palmer*, 641 F.2d at 1155.

Summary judgment was appropriate on the claims based on these supposed fiduciary duties.

### E. *Breach of Restrictive Covenant (Developers' Counterclaim)*

Lastly, Legacy argues that the district court erred by granting the developers summary judgment on their breach of restrictive covenant

counterclaim. Under the declaration of reservations, the development lots may be used only for "single-family mobile home dwelling[s]." Additionally, the declaration of reservations requires "improvements" to be pre-approved by the architectural committee and reserves a right of way and easement for utilities and drainage. The district court found that Legacy's road violated the declaration of reservations because Legacy did not first obtain the architectural committee's approval.

As before, Legacy argues that its road is not a road but a driveway. Alternatively, Legacy argues that it did not build anything on the development lots at all. The "driveway" argument fails for the same reason that it failed before: the record flatly contradicts any suggestion that the road is intended as a driveway instead of as a shortcut to the highway and planned future amenities, as Legacy publicly advertised. *See Scott*, 550 U.S. at 380 (holding courts should disregard a version of events that is "blatantly contradicted by the record, so that no reasonable jury could believe it" at summary judgment). It also fails for the independent reason — which Legacy does not dispute on appeal — that Legacy did not get the architectural committee's approval before building the "driveway."

Legacy's second argument that it did not build anything on the development lots is contradicted by the record. *See id.* The record contains clear photographic evidence that Legacy bulldozed over not only the five-foot-wide strip of greenbelt but also over part of the development lots. At his deposition, Hodgson admitted that Legacy did this as part of its plan to build a road connecting the back of the neighborhood to the nearby highway. Legacy openly advertised the road as accessible from the development lots. That Legacy did not pave over the newly flattened section of the development lots does not deprive the road of its status as an improvement for which Legacy needed advance approval from the architectural committee. The district court did not err.

No. 24-50462

We MODIFY the judgment to dismiss the regulatory takings claim without prejudice insofar as it challenged the two-permit cap and AFFIRM the judgment as modified.